IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Christopher Lee Parrott, | ) | C/A No.: 1:12-2725-DCN-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as the defendant in this lawsuit.

I.     Relevant Background

A.     Procedural History

On December 28, 2009, Plaintiff filed applications for DIB and SSI in which he alleged his disability began on February 18, 2009.  Tr. at 137–44.  His applications were denied initially and upon reconsideration.  Tr. at 76, 78–79, 81.  On April 27, 2011, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Marcus Christ.  Tr. at 35–75 (Hr'g Tr.).  The ALJ issued an unfavorable decision on May 12, 2011, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 21–29.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 21, 2012.  [Entry #1].

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 35 years old at the time of the hearing.  Tr. at 137.  He completed high school and earned a two-year associates degree in business.  Tr. at 47.  His past relevant work ("PRW") was clerical and as a material handler and forklift operator.  Tr. at 64.  He alleges he has been unable to work since February 18, 2009.  Tr. at 137, 141.

2.     Medical History

a.     Smith Medical Center

Plaintiff saw Susan Surratt, M.D., and Rex Quigley, M.D., at Smith Medical Center periodically throughout the relevant time period.  At a visit on February 19, 2009

(Plaintiff's alleged onset date), doctors noted that, in addition to HIV, Plaintiff had depression, high cholesterol, and neck pain. Tr. at 376, *see also* Tr. 449–52. At a visit the next month, doctors noted that Plaintiff was stressed over his HIV diagnosis. Tr. at 375. He was prescribed Zoloft and it was noted that Prozac had not helped his irritability and depression. *Id.* In October 2009, Plaintiff reported that he was still having neck and back pain, and that Flexeril helped his pain. Tr. at 372. An x-ray of Plaintiff's lumbar and thoracic spine was normal. Tr. at 293. On December 22, 2009, Plaintiff reported that his neck and back were bothering him. Tr. at 371. He said he was tired and stressed all of the time. *Id.*

On January 4, 2010, Plaintiff said Effexor did not help with his depression. Tr. at 370. He also stated that he was taking Wellbutrin and had tried Zoloft and Prozac without success. *Id.* He had spasms in his lower back and was tender at C6–7. *Id.* On January 20, 2010, Plaintiff was seen for severe depression, limited range of motion in his neck and back, and weight loss. Tr. at 368. The treatment provider ordered MRIs of Plaintiff's cervical and lumbar spine. *Id.* An MRI of Plaintiff's lumbar spine from January 22, 2010, revealed L4–5 with a mild broad-based disc bulge, but no disc herniation or narrowing (stenosis). Tr. at 297. An MRI of Plaintiff's cervical spine showed minimal disc bulging at C3–4 without effacement or herniation. Tr. at 298–99. X-rays of Plaintiff's cervical spine were normal. Tr. at 296.

On January 27, 2010, Plaintiff returned to Smith Medical Clinic with neck and low back pain. Tr. at 366. Dr. Quigley noted the negative findings of Plaintiff's MRIs, including degenerative disc disease of the lumbar spine, and diagnosed cervical and

lumbar muscle spasms. *Id.* Doctors increased Plaintiff's Tramadol dosage and ordered him to continue taking ibuprofen and Flexeril. *Id.* In February 2010, doctors noted that Plaintiff's pain levels were stable. Tr. at 363. On April 21, 2010, Plaintiff was seen for cervical and lumbar spondylosis and depression. Tr. at 394. It was noted that he was obtaining some relief from pain with gabapentin (Neurontin) and his dosage was increased. *Id.* On May 19, 2010, Plaintiff reported a decrease in his average level of pain, but stated that it was still constant at a level six out of 10. Tr. at 395. On June 23, 2010, Plaintiff had just started taking Lyrica, and Hydrocodone was considered. Tr. at 396. On August 11, 2010, Plaintiff stated he had stopped taking Lyrica because of insurance problems and he received no relief from Tramadol. Tr. at 466. On August 25, 2010, Plaintiff received an injection at L4–5. Tr. at 467. On October 6, 2010, Plaintiff had resumed taking Lyrica and stated that he required less hydrocodone for adequate pain relief. Tr. at 470. On December 1, 2010, Plaintiff's dosage of Lyrica was increased and he was also prescribed hydrocodone. Tr. at 472. On January 5, 2011, Plaintiff reported increased pain and depression. Tr. at 473. On February 2, 2011, Plaintiff was seen with continued neck pain and low back pain with bilateral radiation. Tr. at 474. He reported being unable to sleep, even after taking Ativan, Hydrocodone, Flexeril, and ibuprofen. *Id.*

### b.    Beth Cardosi, M.D.

Plaintiff also saw Beth Cardosi, M.D., at CareTeam (a nonprofit organization dedicated to those affected by HIV) approximately every three months throughout the relevant time period. Dr. Cardosi adjusted Plaintiff's medications at these visits. For

example, in March 2009, Dr. Cardosi noted that Plaintiff was doing better on Zoloft than he had been on Prozac (Tr. at 329–30), and, in August 2009, she started him on Wellbutrin to see if it would improve his energy (Tr. at 328). In November 2009, Dr. Cardosi noted that Plaintiff was doing well physically, but was still depressed and was taking care of his father who had experienced a stroke. Tr. at 327. She diagnosed him with HIV, depression/fatigue, and high cholesterol. *Id.* In February 2010, Dr. Cardosi noted that Plaintiff had lost weight over the prior year and had a rash in his groin area. Tr. at 326. In June 2010, she noted Plaintiff's complaints of fatigue, panic attacks, and mood swings. Tr. at 387–88. Plaintiff also reported increased stress, anxiety, and depression; and continued back and neck pain. *Id.* In October 2010, Dr. Cardosi again noted Plaintiff's complaints of panic attacks, moodiness, insomnia, and fatigue, but noted that he was doing "ok" on his HIV medication regimen and encouraged exercise. Tr. at 463. On January 13, 2011, Plaintiff was seen for fatigue, back and neck pain, increased anxiety, HIV, and severe depression. Tr. at 464. He noted night sweats and memory changes. *Id.*

c.    Mental Health Treatment

On January 7, 2010, following referral from Dr. Cardosi, Plaintiff presented to the Waccamaw Center for Mental Health for treatment with feelings of hopelessness, worthlessness, and fatigue. Tr. at 284–86. The mental health center evaluated Plaintiff and noted normal speech, intact attention, good judgment and insight, a euthymic mood, an appropriate affect, and goal directed thought processes. Tr. at 285. Therapists diagnosed depression and adjustment disorder and assigned Plaintiff a Global Assessment

of Functioning (GAF)[2] score of 60.  Tr. at 286.  The mental health center declined to treat him because he did not meet their treatment criteria, but noted that Plaintiff would benefit from other counseling and an HIV support group.  Tr. at 367.

Plaintiff began seeing nurse practitioner Pat Zahniser at the NCB Counseling Center on January 14, 2010.  Tr. at 321.  Plaintiff reported chronic fatigue; depression; and feelings of hopelessness, helplessness, fear, and anxiety.  *Id.*  Plaintiff stated that he had tried a number of antidepressants without relief and was currently taking Cymbalta and Wellbutrin.  *Id.*  On January 21, 2010, Plaintiff reported decreased energy and fatigue.  Tr. at 322.  He stated that he was withdrawn, had increased anxiety, could not handle stress, and had daily panic attacks.  *Id.*  On January 28, 2010, Plaintiff reported increased fatigue, decreased motivation, and two or three panic attacks daily that lasted for 30 to 60 minutes.  Tr. at 323.  Plaintiff continued to see Ms. Zahniser approximately once every two weeks for the remainder of 2010 and during early 2011.  Tr. at 324–25, 398–419, 482–91.  Ms. Zahniser's treatment notes and Plaintiff's emails to her chronicle continued complaints of stress (including stress triggered by family and financial situations), depression, anxiety, panic attacks (daily at times), increased fatigue, headaches, weight loss, decreased concentration, and side effects from his medications (including complaints of feeling like he was in a "fog" or a "daze").  *See* Tr. at 323–25,

---

[2]  "Clinicians use a GAF to rate the psychological, social, and occupational functioning of a patient." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 n. 1 (9th Cir. 1999).

398–419, 482–91.  Ms. Zahniser consistently noted Plaintiff's diagnoses of recurrent major depression and generalized anxiety disorder.  *See, e.g.*, Tr. at 321.

### d.      Contact with Social Security Administration

In a report of contact dated February 2, 2010, Plaintiff reported taking a 30- to 45-minute walk daily after breakfast, preparing meals on the stovetop for 30 to 60 minutes, performing household chores for two hours at a time three days per week, sitting for one to three hours at a time to watch television or movies, attending counseling three times per week and church two times per week, and confiding in and seeking support from his aunt.  Tr. at 199.

### e.      Opinion Evidence

In February 2010, state-agency psychologist Lisa Clausen, Ph.D., reviewed Plaintiff's medical records and opined that he had non-severe anxiety and depression resulting in mild restriction of his activities of daily living ("ADLs"); mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace.  Tr. at 349–62.

In August 2010, state-agency psychologist Michael Neboschick, Ph.D., reviewed Plaintiff's medical records and opined that Plaintiff had severe anxiety and depression resulting in mild restriction of his ADLs; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 420–32.  Dr. Neboschick opined that Plaintiff was not significantly limited in 15 areas of work-related functioning and was moderately limited in the other five areas of functioning.  Tr. at 434–35.  Dr. Neboschick concluded that, despite his limitations,

Plaintiff could perform simple tasks for two-hour periods without supervision and that he could attend work regularly, but may miss an occasional day of work due to his symptoms.  Tr. at 436.

Also in August 2010, state-agency doctor Mary Lang, M.D., reviewed Plaintiff's medical records and offered an opinion on Plaintiff's physical work-related limitations. Tr. at 438–45.  Dr. Lang opined that Plaintiff could lift and/or carry 10 pounds frequently and 20 pounds occasionally; sit, stand, and/or walk six hours each in an eight-hour workday; occasionally climb; frequently perform all other postural activities; and should avoid concentrated exposure to hazards.  *Id.*

In February 2011, Dr. Quigley completed a medical source statement regarding Plaintiff's work-related limitations stemming from his back pain.  Tr. at 447–48.  In the statement, Dr. Quigley indicated that Plaintiff had severe pain, severe depression resulting from his HIV diagnosis, and markedly decreased strength.  *Id.*  Dr. Quigley opined that Plaintiff could sit and stand for 15 minutes at a time; work for one hour per day; lift 10 pounds occasionally and zero pounds frequently; and could occasionally bend and stoop.  Tr. at 447.  Dr. Quigley concluded: "I do feel this person is both physically and mentally disabled from holding any job that I can think of."  Tr. at 448.

In April 2011, Dr. Cardosi completed two medical source statements regarding Plaintiff's work-related limitations stemming from his HIV and depression/anxiety.  With regard to the limitations stemming from Plaintiff's HIV, Dr. Cardosi opined that Plaintiff had marked restrictions in his ADLs, marked difficulties in maintaining social functioning, and experienced side effects from his medications, including fatigue.  Tr. at

453–56.  Dr. Cardosi opined that Plaintiff could work for two hours during an eight-hour workday; stand for 30 minutes at a time; sit for two hours at a time; could lift five pounds occasionally; and could do no frequent lifting.  Tr. at 455.  She also opined that Plaintiff did not have any significant limitations in two areas of work-related functioning (including in his ability to understand, remember, and carry out short, simple instructions) and moderate limitations in three areas of work-related functioning.  *Id.*  Dr. Cardosi stated that Plaintiff suffered from constant back pain requiring multiple medications.  Tr. at 456.

With regard to the limitations stemming from Plaintiff's depression and anxiety, Dr. Cardosi opined that Plaintiff had moderate restrictions in his ADLs, marked difficulty maintaining social functioning, and deficiencies in concentration.  Tr. at 475–76.  Dr. Cardosi wrote "absent" in response to a question of whether Plaintiff had a complete inability to function outside his home due to his panic attacks.  *Id.*  Dr. Cardosi further opined that Plaintiff was not significantly limited in 10 areas of work-related functioning; moderately impaired in seven areas of functioning; markedly impaired in one area of work-related functioning (using public transport); and extremely impaired in one area of work-related functioning (setting goals).  Tr. at 476–77.  Dr. Cardosi added that Plaintiff had not responded well to psychiatric medication or therapy.  Tr. at 477–78.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on April 27, 2011, Plaintiff testified that he was diagnosed with HIV in February 2009 and that the diagnosis, along with the death of his mother and the ill health of his father, aggravated his already-existing depression.  Tr. at 50–51.  He stated that he lived alone and drove only short distances because riding in a car longer than 20 or 30 minutes caused increased pain in his lower back.  Tr. at 41–42, 48.  He said that he left his house twice a week to run errands (including picking up medications and grocery shopping) and to see his stepfather who lived 10 miles from him.  Tr. at 51–52.  He estimated that he did not get dressed, bathe, or leave the house four or five days a week.  Tr. at 52.

Plaintiff stated that his neck and back pain limited his ability to lift, and he estimated that he could lift 10 to 15 pounds at a time occasionally.  Tr. at 38–40.  He stated that he experienced a fairly constant burning and jabbing sensation in his lower back that had worsened over the prior couple of years.  Tr. at 42.  He estimated that he could sit and stand for 15 to 20 minutes at a time and could walk a half block before he experienced burning and jabbing pain.  Tr. at 53.  He also estimated that he slept for three hours of an eight-hour period during the day and stated that he had bad headaches four or five days per week.  Tr. at 53–54.  Plaintiff said he took 10 or 11 medications per day and that his medications had side effects, including drowsiness, fatigue, nausea, and constipation.  Tr. at 55.  He stated that in a work setting, he was unable to deal with

stress, get along with coworkers or supervisors, and deal with the pressure of deadlines. Tr. at 43.

### b.    Lay Witness Testimony

Plaintiff's stepfather, William Van Blake, also testified at the hearing.  Tr. at 57–58.  Mr. Van Blake stated that he helped Plaintiff financially and saw him approximately twice per week.  Tr. at 58.  He said that Plaintiff's medication put him in a fog.  Tr. at 60. He testified that Plaintiff napped for an hour or more every time he visited Mr. Van Blake.  *Id.*  Mr. Van Blake stated that Plaintiff was very fatigued and had frequent headaches.  Tr. at 62–63.

### c.    Vocational Expert Testimony

Vocational Expert ("VE") Kristin Cicero reviewed the record and testified at the hearing.  Tr. at 63.  The VE categorized Plaintiff's PRW doing clerical work as sedentary or light work that was either skilled or semi-skilled; as a material handler as heavy, semi-skilled work; and as a forklift operator as medium, semi-skilled work.  Tr. at 64–65.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally stoop and crouch; and never engage in repetitive rotation, flexing, or extension of the neck.  Tr. at 65.  The individual was further limited to simple, routine, and repetitive tasks; a low-stress job with only occasional changes in the work setting; no production or pace work; occasional interaction with the public and co-workers; no tandem tasks; and no concentrated exposure to machinery or heights.  Tr. at 65–66.  The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW.

Tr. at 66. The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform. *Id.* The VE identified the jobs of laundry worker, office helper, and inspector. *Id.* The ALJ then offered a second hypothetical limiting the individual to sedentary work and the same remaining limitations from the first hypothetical. Tr. at 66–67. The VE stated that the hypothetical individual could not perform Plaintiff's PRW, but could perform the jobs of surveillance systems monitor, inspector, and lens inserter. Tr. at 67–68.

The VE also testified that if the hypothetical individual were to miss more than three days of work per month or be off task more than two hours per day due to medical impairments, there would be no jobs available. Tr. at 68. Upon questioning by Plaintiff's counsel, the VE testified that all of the jobs she identified would be eliminated if the hypothetical individual had to take an unscheduled break of one hour per day due to fatigue; suffered from deficiencies of concentration and persistence or pace that resulted in him frequently failing to complete work tasks; could only work alone; or could not lift any weight on a frequent basis. Tr. at 69–71.

2.     The ALJ's Findings

In his decision dated May 12, 2011, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.
2.     The claimant has not engaged in substantial gainful activity since February 18, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.     The claimant has the following severe impairments: depression, back pain, and HIV. (20 CFR 404.1520(c) and 416.920(c)).

12

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).  Specifically, the claimant is able to lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for 6 hours in an 8-hour day except that the claimant can never climb ladders, ropes or scaffolds, and can only occasionally climb ramps or stairs.  The claimant can only occasionally stoop and crouch, cannot have repetitive rotation of his neck, and cannot have concentrated exposure to moving machinery or unprotected heights. The claimant is limited to simple, repetitive and routine tasks, a low-stress work environment, can only have occasional changes in his work setting, and cannot perform production, pace, or tandem tasks.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on May 24, 1975 and was 33 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from February 18, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 23–28.

D.    Appeals Council Review

Plaintiff submitted additional evidence to the Appeals Council. The evidence showed that Plaintiff continued to see doctors at CareTeam throughout 2011 and early

2012, and complained of continued anxiety and depression, as well as weight gain. Tr. at 537–40, 542. Plaintiff established care at the St. James Santee Family Health Center in mid-2011, and presented there regularly for medication management though March 2012, but these notes are largely illegible. Tr. at 530–36. During the last three months of 2011, Plaintiff also went to physical therapy for his back pain. Tr. at 579–648.

Plaintiff also continued to attend counseling sessions approximately every two weeks through mid-2012. At these sessions, he continued to complain of continued anxiety, depression, panic attacks, and decreased energy. Tr. at 544–77. On March 30, 2012, Plaintiff discussed suicidal thoughts and plans. Tr. at 576. He identified severe feelings and thoughts of hopelessness and worthlessness. *Id.* He was admitted to Lighthouse Care Center of Conway until April 5, 2012. Tr. at 503–09. Upon discharge Plaintiff felt much better with medication changes. Tr. at 577.

## II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to properly assess the opinions of Plaintiff's treating physicians;

2)    the ALJ erred in concluding that Plaintiff's anxiety was not a severe impairment;

3)    the ALJ failed to properly evaluate Plaintiff's residual functional capacity ("RFC"); and

4)    the ALJ erred in his evaluation of Plaintiff's credibility.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

14

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493

impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); § 416.920(a), (b), Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls*

---

U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

*v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.       The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Credibility Assessment

Plaintiff contends that the ALJ erred in his credibility assessment because his findings were contrary to the record evidence and he relied solely on a lack of objective medical evidence, rather than considering the factors set forth in SSR 96-7p. [Entry #21 at 36–40; #24 at 5–6]. The Commissioner responds that the ALJ reasonably relied on a lack of objective medical evidence in finding Plaintiff's pain complaints to be incredible. [Entry #23 at 17–18].

Prior to considering a claimant's subjective complaints, an ALJ must find a claimant has an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause subjective complaints of the severity and persistence alleged. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p; *Craig*, 76 F.3d 585, 591–96 (4th Cir. 1996) (discussing the regulation-based two-part test for evaluating pain). The first part of the test "does not . . . entail a determination of the intensity, persistence, or functionally limiting effect of the claimant's asserted pain." 76 F.3d at 594 (internal quotation omitted). Second, and only after claimant has satisfied the threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." *Id.* at 595. This second step requires the ALJ to consider the record as a whole, including both objective and

subjective evidence, and SSR 96-7p cautions that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p, ¶ 4.

If an ALJ rejects a claimant's testimony about her pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, ¶ 5. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors

concerning the individual's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process.  *See Craig*, 76 F.3d at 591–96. The ALJ found Plaintiff's impairments could reasonably be expected to cause some of the symptoms he alleged, but determined that Plaintiff's testimony "concerning the intensity, persistence and limiting effects" of his symptoms was "not entirely credible to the extent" the testimony was inconsistent with the ALJ's determination of his RFC.  Tr. at 25.

The ALJ went on to state that Plaintiff's complaints of neck and back pain were unsupported because imaging demonstrated mild abnormalities, nothing in the record suggested that his condition had worsened, and that "treatment notes regularly indicate that he is doing well physically and that he was able to care for his father, who had suffered a stroke."  Tr. at 25–26.  With regard to Plaintiff's allegations of extreme fatigue and inability to sit or stand for any period of time, the ALJ stated that such allegations were inconsistent with the medical evidence of record.  Tr. at 26.  The ALJ further stated that Plaintiff's alleged mental difficulties were discredited by "several normal mental status examinations" and the conclusion by the Waccamaw Center for Mental Health that Plaintiff did not have a major chronic mental illness requiring mental health treatment. *Id.*  Finally, the ALJ noted that Plaintiff's ADLs are intact, he receives moral support from his aunt, and he has maintained the ability to deal with his illness through counseling and support groups.  *Id.*

20

The undersigned finds unsupported the ALJ's finding that Plaintiff's allegations of extreme fatigue are not fully supported because they are inconsistent with the medical evidence of record.  Tr. at 26.  The record is replete with Plaintiff's documented complaints of fatigue.  *See, e.g.*, 284, 321–23, 327–28, 387–88, 401, 405, 463.  Thus, the ALJ erred in relying on a lack of record support in discrediting Plaintiff's complaints of fatigue.

In addition, the ALJ's statement that Plaintiff has had "several normal mental status examinations" is misleading.  The ALJ cites to only one record in support of this assertion and disregards, without explanation, the many medical records documenting Plaintiff's reports of increasing depression that are consistent with his testimony.  *See, e.g.*, Tr. at 326, 387, 473.  Because the ALJ failed to explain his disregard of the records supporting Plaintiff's complaints, the undersigned is unable to determine whether his decision to discount Plaintiff's credibility is supported by substantial evidence.

Finally, the credibility assessment relies heavily on a lack of objective evidence (Tr. at 25–26) and, in citing a lack of objective evidence as the only support for the ALJ's credibility determination, the Commissioner appears to acknowledge this point.  [Entry #23 at 17–18].  In *Mickles v. Shalala*, the Fourth Circuit Court of Appeals held that when a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence."  *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994).  Objective medical evidence of pain should be gathered and considered,

but the absence of such evidence is not determinative. *Hyatt v. Sullivan*, 899 F.2d 329, 337 (4th Cir. 1990). Thus, to the extent the ALJ's credibility assessment may be found to be dependent solely on a lack of objective evidence, it is not in compliance with Fourth Circuit precedent.

For the foregoing reasons, the undersigned recommends a finding that the ALJ's credibility assessment is not support by substantial evidence.

2. RFC Determination

Plaintiff also contends that the ALJ conducted an improper RFC determination because he failed to properly explain why he accepted or rejected Plaintiff's alleged functional limitations. [Entry #21 at 35]. Specifically, Plaintiff asserts that the ALJ failed to explain his RFC findings as they relate to the alleged side effects of Plaintiff's medications. *Id.* The Commissioner responds that the RFC determination is legally sufficient to permit judicial review and is supported by substantial evidence. [Entry #23 at 18–19].

The ALJ's RFC assessment should be based on all the relevant evidence. 20 C.F.R. §§ 404.1545(a), 416.945(a). Social Security Ruling 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8p. The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ." *Id.* The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule. *Id.*

Plaintiff's allegation of error rests primarily upon the ALJ's failure to address the alleged side effects of Plaintiff's medication.  At the hearing, Plaintiff testified that his medications made him drowsy, nauseous, and constipated.  Tr. at 55.  He stated that ever since he had been on the medication, he felt like he was in a fog most of the time.  *Id.*  Mr. Van Blake also testified that Plaintiff's medication put him in a fog.  Tr. at 60.  Ms. Zahniser's records also reflect that Plaintiff reported on June 24, 2010, that his medications made him feel like he was in a fog.  Tr. at 414.  On June 29, 2010, he reported that he had to lie down and take a nap after taking his medications.  Tr. at 416.

The Commissioner argues that the ALJ took Plaintiff's medication side effects into account because he "stated multiple times that he considered all of the evidence, and specifically acknowledged Plaintiff's complaints regarding his medication side effects." [Entry #23 at 19 (internal citations omitted)].  A review of the ALJ's decision reveals that the only reference to Plaintiff's medication side effects was in the ALJ's summary of Plaintiff's hearing testimony, in which the ALJ noted that Plaintiff "complained of headaches and side effects from his medications."  Tr. at 25.  The ALJ failed to address the alleged medication side effects in the credibility determination or in the RFC determination.  Thus, it is not clear whether he considered them in assessing Plaintiff's functional limitations.  Despite the Commissioner's unsupported contention, the ALJ's general statements that he "considered all of the evidence" are insufficient to satisfy SSR 96–8p.

Because Plaintiff has alleged medication side effects severe enough to impact his functional abilities and the ALJ failed to address them in determining his RFC, the

undersigned recommends a finding that the RFC determination is not supported by substantial evidence.

### 3.    Remaining Allegations of Error

Because the undersigned recommends remand based on the ALJ's improper credibility and RFC determinations, Plaintiff's remaining allegations of error are not addressed.  However, on remand, the undersigned recommends directing the ALJ to consider whether Plaintiff's anxiety is a severe impairment and properly explain his finding on that issue.[5]  The undersigned further recommends directing the ALJ to consider the opinions of Drs. Quigley and Cardosi in accordance with the factors set forth in 20 C.F.R. § 404.1527(c)(2) and to provide record citations for any finding that the opinions of Plaintiff's treating physicians are inconsistent with the medical evidence.

## III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law.  Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence.  Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of

---

[5] The undersigned notes that the Commissioner's reliance on a harmless error argument in response to Plaintiff's severe impairment argument (Entry #23 at 10–11) suggests that the Commissioner concedes that the ALJ should have found anxiety to be a severe impairment.

42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

Shiva V. Hodges

November 21, 2013                          Shiva V. Hodges
Columbia, South Carolina                   United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).